COPY

2014 MAY -6  PM 3:27

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY: _____

FILED

1  THE WEISER LAW FIRM, P.C.
2  KATHLEEN A. HERKENHOFF (168562)
   12707 High Bluff Drive, Suite 200
3  San Diego, CA 92130
   Telephone:  (858) 794-1441
4  Facsimile:  (858) 794-1450
5  kah@weiserlawfirm.com

6  Attorneys for Qui Tam Plaintiffs

7

8                   UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10 UNITED STATES OF AMERICA, *ex*      )  Case No. CV14 - 3488 956 -AS
   *rel.*, JOHN DOE and ABC, LLC,      )
11                                     )  **FILED UNDER SEAL PURSUANT**
                         Plaintiffs,   )  **TO 31 U.S.C. §3730**
12                                     )
           vs.                         )  **DO NOT PLACE IN PRESS BOX**
13                                     )  **DO NOT ENTER IN PACER**
   INSYS THERAPEUTICS, INC, ALEC       )
14 BURLAKOFF and MICHAEL L.            )  COMPLAINT FOR DAMAGES
   BABICH,                             )  UNDER THE FEDERAL FALSE
15                                     )  CLAIMS ACT
                         Defendants.   )
16 _____  )
                                       )  **DEMAND FOR JURY TRIAL**
17

18

19

20

21

22

23

24

25

26

27

28

1.     The United States of America (the "Government" or "United States"), by and through their qui tam Relators, John Doe and ABC, LLC (the "Relators" or "Qui Tam Plaintiffs"), bring this action under the Federal False Claims Act, 31 U.S.C. §3729-3733, *et seq.* (the "False Claims Act" or "FCA") against Insys Therapeutics, Inc. ("Insys"), Alec Burlakoff ("Burlakoff"), and Michael L. Babich ("Babich") (collectively, "Defendants") to recover all damages, penalties, and other remedies provided by the False Claims Act on behalf of the United States and the Relators, and for their complaint allege as follows.

2.     Based on the Relators' personal knowledge and further investigation, from at least June 2013 through the present, sufficient evidence, including statements by the Relators as well as documents and other information they have obtained, exists to allege that Defendants have violated and continue to violate the False Claims Act, 31 U.S.C. §3729, and the federal Anti-Kickback Statute, 42 U.S.C. §1320a-7b(b)(2)(B) (the "Anti-Kickback Statute"), by submitting fraudulent bills to the Government (and/or through its conduct causing others to submit fraudulent bills to the Government) as a result of off-label marketing and an unlawful kickback scheme in connection with its drug Subsys that was intended to, and did in fact, induce physicians to improperly prescribe Subsys.

**PARTIES**

3.     John Doe ("Relator 1") worked at Insys from June 2013 through August 2013.   Relator 1 was one of Insys' Specialty Sales Representatives and his responsibilities included, among other things, assisting in launching Insys' pain management drug Subsys, and conducting in-services with physicians, staffs, and pharmacists.

4.     ABC, LLC is a Delaware Limited Liability Company whose main address is 800 Delaware Avenue, Wilmington, DE, and which was formed for the purpose of bringing this action.

5.     Plaintiff United States of America, acting through the Department of

- 1 -

Health and Human Services ("HHS"), and its Centers for Medicare and Medicaid Services ("CMS"), administers the Health Insurance Program for the Aged and Disabled established by Title XVIII of the Social Security Act, 42 U.S.C. §§1395, *et seq*. ("Medicare").

6.    Defendant Insys is a specialty pharmaceutical company that develops and commercializes supportive care products.  In March 2012, Insys launched Sybsys, a proprietary sublingual fentanyl spray approved for breakthrough cancer pain in opioid-tolerant patients.

7.    Defendant Burlakoff is Insys' Vice President of Sales.

8.    Defendant Babich is Insys' Chief Executive Officer.

## JURISDICTION AND VENUE

9.    Jurisdiction in this Court is proper pursuant to 31 U.S.C. §§3732(a) and 3730(b).  This Court also has jurisdiction pursuant to 28 U.S.C. §1331.

10.    The Court may exercise personal jurisdiction over the Defendants, and venue is proper in this Court pursuant to 31 U.S.C. §3732(a) and 28 U.S.C. §1391 because the acts proscribed by 31 U.S.C. §§3729 et seq., and complained of herein took place in part in this District and the Defendants transacted business in this District as described herein.

11.    Pursuant to 31 U.S.C. §3730(b)(2), Relators prepared and will serve the complaint on the Attorney General of the United States, and the United States Attorney for the Central District for the District of California, as well as a statement of all material evidence and information currently in its possession and of which it is the original source.  These disclosure statements are supported by material evidence known to the Relators at the time of filing establishing the existence of Defendants' false claims.  Because the statements include attorney-client communications and work product of Relators' attorneys, and will be submitted to those federal officials in their capacity as potential co-counsel in the litigation, Relators understand these disclosures to be confidential and exempt from disclosure under the Freedom of

Information Act.  5 U.S.C. §552; 31 U.S.C. §3729(c).

## LEGAL BACKGROUND

**The False Claims Act**

12.     The False Claims Act provides, in pertinent part:

(a)     Liability for Certain Acts.

(1) In general. –  Subject to paragraph (2), any person who –

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

(D) has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property;

(E) is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(F) knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge property; or

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or

1     transmit money or property to the Government, or

2     knowingly conceals or knowingly and improperly avoids or

3     decreases an obligation to pay or transmit money or

4     property to the Government, is liable to the United States

5     Government for a civil penalty of not less than $5,000 and

6     not more than $10,000, as adjusted by the Federal Civil

7     Penalties Inflation Adjustment Act of 1990 (28 U.S.C.

8     §2461 (notes); Public Law 104-410), plus 3 times the

9     amount of damages which the Government sustains

10     because of the act of that person.

11     (3) Costs of civil actions. – A person violating this subsection

12     shall also be liable to the United States Government for the costs of a

13     civil action brought to recover any such penalty or damages.

14     (b) Definitions. –  For purposes of this section –

15     (1) the terms "knowing" and "knowingly" –

16     (A) mean that a person, with respect to information –

17     (i) has actual knowledge of the information;

18     (ii) acts in deliberate ignorance of the truth or falsity

19     of the information; or

20     (iii) acts in reckless disregard of the truth or falsity

21     of the information; and

22     (B) require no proof of specific intent to defraud;

23     (2) the term "claim" –

24     (A) means any request or demand, whether under a contract

25     or otherwise, for money or property and whether or not the

26     United States has title to the money or property, that—

27     (i) is presented to an officer, employee, or agent of

28     the United States; or

- 4 -

1   (ii) is made to a contractor, grantee, or other

2   recipient, if the money or property is to be spent or

3   used on the Government's behalf or to advance a

4   Government program or interest, and if the United

5   States Government –

6   (I) provides or has provided any portion of the

7   money or property requested or demanded; or

8   (II) will reimburse such contractor, grantee, or

9   other recipient for any portion of the money or

10   property which is requested or demanded; and

11   (B) does not include requests or demands for money or

12   property that the Government has paid to an individual as

13   compensation for Federal employment or as an income

14   subsidy with no restrictions on that individual's use of the

15   money or property;

16   (3) the term "obligation" means an established duty, whether or

17   not fixed, arising from an express or implied contractual, grantor-

18   grantee, or licensor-licensee relationship, from a fee-based or similar

19   relationship, from statute or regulation, or from the retention of any

20   overpayment; and

21   (4) the term "material" means having a natural tendency to

22   influence, or be capable of influencing, the payment or receipt of money

23   or property.

24   13.    Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990,

25   as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. §2461

26   (notes), and 28 C.F.R. §85.1, False Claims Act civil penalties were increased from

27   $5,000 to $11,000 for violations occurring on or after September 29, 1999.

28

**The Anti-Kickback Statute**

14.     The Anti-Kickback Statute, 42 U.S.C. §1320a-7b(b)(2)(B), prohibits offering to pay or paying any remuneration[1] "to any person to induce such person to purchase . . . any good . . . service, or item for which payment may be made in whole or in part under a Federal healthcare program." Id.  Pursuant to the Anti-Kickback Statute, it is unlawful to knowingly offer or pay any remuneration in cash or in kind in exchange for the referral of any product (including a prescription drug product) for which payment is sought from any federally-funded health care program, including Medicare and Medicaid.  In order to ensure compliance, every federally-funded health care program requires every provider or supplier to ensure compliance with the provisions of the Anti-Kickback Statute and other federal laws governing the provision of health care services in the United States.

15.     The Anti-Kickback Statute is designed to, inter alia, ensure that patient care will not be improperly influenced by inappropriate compensation from the pharmaceutical industry.  Kickbacks increase Government-funded health benefit program expenses by inducing medically unnecessary overutilization of prescription drugs and excessive reimbursements.  Kickbacks also reduce a patient's healthcare choices, as physicians may prescribe drug products based on the physician's own financial interests rather than according to the patient's medical needs.

16.     In accordance with the Anti-Kickback Statute, applicable regulations directly prohibit providers from receiving remuneration paid with the intent to induce referrals or business orders, including the prescription of pharmaceuticals paid as a result of the volume or value of any referrals or business generated.  *See* 42 C.F.R. §1001.952(f).  Thus, drug companies may not offer or pay any remuneration, in cash or kind, directly or indirectly, to induce physicians or others to order or recommend drugs that may be paid for by a federal health care program.  The law not only

---

[1]     The term "any remuneration" encompasses any kickback, bribe, or rebate, direct or indirect, overt or covert, in cash or in kind.  Anti-Kickback Statute, 42 U.S.C. §1320a-7b(b)(1).

1  prohibits outright bribes and rebate schemes, but also prohibits any payment by a drug

2  company that has as one of its purposes inducement of a physician to write additional

3  prescriptions for the company's pharmaceutical products.  Such remunerations are

4  kickbacks when paid to induce or reward physicians' prescriptions.

5      17.    A violation of the Anti-Kickback Statute constitutes a felony punishable

6  by a maximum fine of $25,000, imprisonment up to five years, or both.  Any party

7  convicted under the Anti-Kickback Statute must be excluded from federal health care

8  programs for a term of at least five years.  42 U.S.C. §1320a-7(b).

9      18.    Compliance with the Anti-Kickback Statute is required for

10  reimbursement of claims from federal health care programs, and claims made in

11  violation of the law are actionable civilly under the FCA.  *See* 42 U.S.C. §1320a-7b(g)

12  (2010) (stating, in part, that a "claim that includes items or services resulting from a

13  violation of . . . [the Anti-Kickback Statute] constitutes a false or fraudulent claim for

14  purposes of [the FCA]. . . ."); United States *ex rel. Wilkins v. United Health Group,*

15  *Inc.*, 659 F.3d 295 (3d Cir. 2011).  The Anti-Kickback Statute was amended in March

16  2010 as part of the Patient Protection and Affordable Care Act ("PPACA"), which

17  clarified that all claims resulting from a violation of the Anti-Kickback Statute are

18  also a violation of the FCA. 42 U.S.C. §1320a-7(b)(g).  The PPACA also amended the

19  Social Security Act's "intent requirement" to make clear that violations of its anti-

20  kickback provisions, like violations of the FCA, may occur even if an individual does

21  "not have actual knowledge" or "specific intent to commit a violation."  Public Law

22  No. 111-148, §6402(h).

23      19.    The Office of the Inspector General of the Department of Health and

24  Human Services ("HHS-OIG"), in April 2003, issued its Compliance Program

25  Guidance for Pharmaceutical Manufacturers, a document meant to provide an

26  overview of pharmaceutical manufacturer compliance guidelines.  HHS-OIG has

27  stated that any time "a pharmaceutical manufacturer provides anything of value to a

28  physician who might prescribe the manufacturer's product, the manufacturer should

1  examine whether it is providing a tangible benefit to the physician with the intent to
2  induce or regard referrals."  HHS-OIG Guidance to Pharmaceutical Manufacturers,
3  April 2003, p. 28 (emphasis added).[2]

4      20.    Compliance with the Anti-Kickback Statute is a condition of payment
5  under federal health care programs.  Therefore any violation of the Anti-Kickback
6  Statute is a violation of the False Claims Act because claims seeking payment for
7  services or prescriptions tainted by kickbacks are "factually false," and therefore do
8  not meet the conditions of payment from federal health care programs.

9  **The Stark Law**

10     21.    The Stark Law, 42 U.S.C. §1395nn, *et seq.*, prohibits a pharmaceutical
11  manufacturer from paying remuneration to physicians for referring Medicaid and/or
12  Medicare patients to the manufacturer for certain "designated health services,"
13  including drug prescriptions, where the referring physician has a nonexempt "financial
14  relationship" with that manufacturer. 42 U.S.C. §1395nn(a)(1), (h)(6). The Stark Law
15  provides that the manufacturer shall not cause to be presented a Medicare or Medicaid
16  claim for such prescriptions.  The Stark Law also prohibits payment of claims for
17  prescriptions rendered in violation of its provisions. 42 U.S.C. §1395nn(a)(1), (g)(1).

18     22.    Knowingly paying physicians to induce them to prescribe a prescription
19  drug on-label or off-label for individuals seeking reimbursement for the drug from a
20  federal health program or causing others to do so, while certifying compliance with
21  the Stark Law (or while causing another to so certify), or billing the Government as if
22  in compliance with these laws, violates the FCA.

23                          **FACTUAL BACKGROUND**

24  **I.    Overview of Medicare and its Benefits**

25     23.    Medicare is a federal health insurance system for people 65 and older and
26  for people under 65 with certain disabilities.

27  ---
[2]   HHS-OIG Guidance to Pharmaceutical Manufacturers, April 2003, p. 28, *available at*
28  http://oig.hhs.gov/fraud/docs/complianceguidance/042803pharmacymfgnonfr.pdf.

24.    Medicare Part D began January 1, 2006 and pays for prescription drug benefits for the elderly and disabled.  42 U.S.C. §1395w-101 *et seq*.  All persons enrolled in Medicare Part A and/or Medicare Part B are eligible to enroll in a prescription drug plan under Part D. HHS, through its component agency, CMS, contracts with private companies (or "sponsors") authorized to sell Part D insurance coverage.  Such companies are regulated and subsidized by CMS pursuant to one-year, annually renewable contracts.

25.    Medicare Part D requires all participants in the program – prescription drug plan ("PDP") sponsors, Pharmacy Benefit Managers ("PBM"), and pharmacies – to adhere to all federal laws and regulations, including those designed to prevent fraud, waste, and abuse.  42 C.F.R. §423.505(h)(1).  Under CMS regulations, PDP sponsors' subcontracts with PBMs and pharmacies must contain language obligating the pharmacy to comply with all applicable federal laws, regulations, and CMS instructions.  42 C.F.R. §423.505(i)(3)(v).

26.    The federal Government's target is to pay 74.5% of the actual costs of basic prescription drug coverage (as defined at 42 U.S.C. §1395w-1029(a)(3)).  42 U.S.C. §1395w-115(a).  Rather than a straight reimbursement, however, the Government uses economic incentives and disincentives to encourage both beneficiaries and Part D Plan Sponsors to reduce costs.  42 U.S.C. §1395w-115.

27.    For beneficiaries, the disincentives for running-up high drug expenditures include requiring them to pay certain amounts out-of-pocket (in the aggregate referred to as a beneficiary's True Out-Of-Pocket ("TrOOP")).  Those sums include:

(a)    a beneficiary premium equal to 25.5% of the national weighted average plan bid, as adjusted (approximately $350), 42 U.S.C. §1395w-113(a);

(b)    a deductible defined as 100% of the first $250, as adjusted (although 90% of Part D Plans eliminate the deductible and use a tiered co-pay), 42 U.S.C. §1395w-102(b)(1);

(c)    thereafter a 25% copay on all costs up to the coverage gap, 42

1 | U.S.C. §1395w-102(b)(2);

2 |       (d)    100% of costs between $2,250 and $3,600, as adjusted, 42 U.S.C.

3 | §1395w-102(b)(3) & (4)  (the "coverage gap" or "donut hole");

4 |       (e)    whereafter, the beneficiary enters the catastrophic coverage phase

5 | and only pays a copay of 5%, or $2 for a generic drug and $5 for any other drug. 42

6 | U.S.C. §1395w-102(b)(4)(A)(i).

7 |     28.    Since beneficiaries are required to pay a significant copay, and 100% of

8 | the cost of drugs while they are in the deductible and coverage gap phases of the

9 | program, Medicare Part D provides certain protections to beneficiaries.  For example,

10 | Sponsors must make the negotiated prices available to beneficiaries regardless of what

11 | "phase" of the Part D benefit an enrollee is in (*i.e.*, deductible, ordinary coverage,

12 | coverage gap or catastrophic coverage).  In addition, that negotiated price must also

13 | remain uniform within a particular pharmacy regardless of what phase of the program

14 | the beneficiary is in.  Prescription Drug Benefit Manual, Ch. 5 "Benefits and

15 | Beneficiary Protections," §20.6 ("the negotiated price for a particular covered Part D

16 | drug purchased at a particular pharmacy must always be the same regardless of what

17 | phase of the Part D benefit an enrollee is in").

18 |     29.    Another beneficiary protection is that, while they are in the deductible or

19 | coverage gap phases where they pay 100% of the costs, they may avail themselves of

20 | a cash price that is better than their PDP's negotiated price if the pharmacy is offering

21 | a "'special' price or other discount for all customers, or if the beneficiary is using a

22 | discount card."  Prescription Drug Benefit Manual, Ch. 14 "Coordination of Benefits,"

23 | at 50.4.2.  If the beneficiary makes such a purchase outside of their plan, their

24 | expenditure will still count toward their TrOOP if they report it to their plan.  *Id.*

25 |     30.    For Part D Plan Sponsors, the program is a quasi-free market model that

26 | uses a variety of incentives which are part of the structure of the program.  The

27 | starting point is that the program only pays the Sponsor "interim payments . . . based

28 | on the Secretary's best estimate of amounts that will be payable after obtaining all of

the information." 42 U.S.C. §1395w-115(d)(1).  In other words, Medicare Part D is not a capitated federal insurance program, but rather an actual cost program.  *Id.*; *see* 42 U.S.C. §1395w-112(g) (prohibiting states from imposing premium taxes on Part D subsidy since, unlike Part C, the payments are not capitated premiums); compare to 42 U.S.C. §1395w-114(c)(2) (expressly authorizing capitated payment only for those Part D beneficiaries in the lowest income tier who qualify for greater subsidy).

31.     In a nutshell, the Sponsor submits a bid based on actuarial data estimating the actual cost of providing prescription drugs to its pool of beneficiaries.  The Government then makes "interim payments" to the Sponsor on a monthly basis.  As an express condition of receiving those interim payments, the Sponsor is required to submit to the Government truthful and complete data, including actual cost, for every prescription filled.  At the end of each year the Government then compares its interim payments to the actual cost data, and determines whether the Sponsor owes a refund to the Government, or whether the Government is required to pay more money in order to meet its subsidy target.  In order to further incentivize the Sponsor to keep costs down, however, the refund or additional payment is first subject to risk corridors which penalize the Sponsor if actual costs exceed its bid, and reward the Sponsor if actual costs are below its bid. 42 U.S.C. §1395w-115(e).  As a practical matter, these risk corridors would only slightly increase or decrease the total percentage paid by the Government for each prescription.

## II.     Medicaid

32.     Medicaid is a joint federal-state program created in 1965 that provides health care benefits for certain groups, primarily the poor and disabled.  The federal portion of each state's Medicaid payments, known as the Federal Medical Assistance Percentage ("FMAP"), is based on the state's per capita income compared to the national average.  42 U.S.C. §1396d(b).  Among the states, the FMAP is at least 50 percent and is as high as 83%.

33.     The Medicaid program pays for services pursuant to plans developed by

the states and approved by the HHS Secretary through CMS. 42 U.S.C. §1396a(a)-(b). States pay doctors, hospitals, pharmacies, and other providers and suppliers of medical items and services according to established rates. 42 U.S.C. §§1396b(a)(1), 1903(a)(1). The federal Government then pays each state a statutorily-established share of "the total amount expended . . . as medical assistance under the State plan . . ." *See* 42. U.S.C. §1396b(a)(1). This federal-to-state payment is known as federal financial participation ("FFP").

34. The Medicaid programs of all states reimburse for prescription drugs. The vast majority of states award contracts to private companies to evaluate and process claims for payment on behalf of Medicaid recipients. Typically, after processing the claims, these private companies then generate funding requests to the state Medicaid programs. Before the beginning of each calendar quarter, each state submits to CMS an estimate of its Medicaid federal funding needs for the quarter. CMS reviews and adjusts the quarterly estimate as necessary, and determines the amount of federal funding each state will be permitted to draw down as it incurs expenditures during the quarter. The state then draws down federal funding as actual provider claims, including claims from pharmacies seeking payment for drugs, are presented for payment. After the end of each quarter, the state then submits to CMS a final expenditure report, which provides the basis for adjustment to the quarterly federal funding amount (to reconcile the estimated expenditures to actual expenditures). 42 C.F.R. §430.30.

## III. The United States Food, Drug, and Cosmetic Act

35. The FDA regulates drugs based on the "intended uses" for such products. Before marketing and selling a prescription drug, a manufacturer must demonstrate to the FDA that the product is safe and effective for each intended use. 21 U.S.C. §§331(d), 355(a).

36. The United States Food, Drug and Cosmetic Act ("FDCA") establishes the framework for regulation of, *inter alia*, the sales and marketing activities of

pharmaceutical manufacturers in the United States, including the introduction of new drugs into interstate commerce.   When the United States Food and Drug Administration ("FDA") approves a drug, it approves the drug only for the particular use for which it was tested.  While a physician may prescribe a drug for a use other than the one for which it is approved, the FDCA prohibits a drug manufacturer from marketing or promoting a drug for non-approved uses. 21 U.S.C. §§331(d), 355(a).  It therefore is illegal for a drug manufacturer and its sales representatives to initiate discussions with medical professionals regarding any off-label use of a drug.

**IV.   Insys' Fraudulent Scheme**

   **A.   False Claims Act Violations**

   37.   Defendants have, since at least June 2013, engaged in off-label marking and an unlawful kickback scheme in connection with its drug Subsys that was intended to, and did in fact, induce physicians to improperly prescribe Subsys.  These prescriptions were reimbursed by federal health care programs, including Medicare and Medicaid, and therefore were issued in violation of both the Anti-Kickback Statute and the FCA.  As a result, the federal Government has been defrauded and suffered a substantial loss.

   38.   To provide some background, Subsys is a potent opioid analgesic, fentanyl, intended for application to the sublingual mucosa.  Subsys is only indicated for the "management of breakthrough pain in cancer patients 18 years of age and older who are already receiving and who are tolerant to opioid therapy for their underlying persistent cancer pain."[3]  *See* Ex. 1 (Subsys packaging insert).[4]  Patients

---

[3]   Subsys   Prescribing   Information,   *available   at* http://subsysspray.com/assets/subsys/client_files/files/PrescribingInfo.pdf.

[4]   The Subsys packaging insert contains the Medication Guide and the Highlights of Prescribing Information. The attached exhibit contains both documents. Both documents are from the FDA's website. Relator 1 does have the original packaging insert, if needed. The Medication Guide is available at http://www.accessdata.fda.gov/drugsatfda_docs/label/2012/202788s000mg.pdf. The Highlights   of   Prescribing   Information   is   available   at http://www.accessdata.fda.gov/drugsatfda_docs/label/2012/202788s000lbl.pdf.

must remain on around-the-clock opioids when taking Subsys.  *Id.*  Subsys has an initial dose of 100 mcg and is dosed in single use spray bottles.

### 1.    Insys Marketed Subsys for Off-Label Use

39.    As discussed in more detail below, Insys actively marketed the off-label use of its drug Subsys, in violation of the FDCA, the Anti-Kickback Statute, the Stark Law, and the FCA.  *See United States v. King-Vassel*, 728 F.3d 707, 709-10 (7th Cir. 2013) ("Under the applicable interlocking provisions of the False Claims Act and laws governing Medicaid, the federal Government generally will not pay for medications prescribed for purposes not approved by the FDA.").  Insys facilitated its fraud through its sales representatives as well as by offering free services to prescribing physicians to ensure that their prescriptions cleared the Government's prior authorization process.

### a.    Insys Trained Its Sales Representatives to Market Insys for Off-Label Use

40.    Insys trained its sales representatives to promote Subsys to physicians for off-label use.  Despite Subsys' indication, which provides, among other things, that it is only for use on cancer patients that are tolerant to other opioids, Insys instructed its sales representatives to "generate market share" for Subsys by targeting and marketing Subsys to physicians whose patients did not have cancer, much less those that were opioid-tolerant.

41.    Sales representatives were the core of Insys' off-label marketing scheme. According to Relator 1, Insys and its most senior executives (who directly took part in training Relator 1 to sell Subsys) did everything they could to ensure that Subsys was marketed and sold off-label.  In fact, Defendants' scheme was so blatant that Relator 1 – throughout the entirety of his employment – never saw any intent or steps taken by Insys senior management to do anything other than market the drug for off-label use.[5]

---

[5]    Even before Relator 1 began his employment, the intent of Insys senior management to promote Subsys off-label was apparent.  For example, prior to joining Insys, Relator 1 had no prior experience in pharmaceutical sales.  When Burlakoff called Relator 1 to offer him the position with

1    Indeed, the only time Insys senior management purported to demonstrate even the

2    vaguest concern for compliance with the laws prohibiting off-label promotion was

3    during brief, pro-forma, recitations that sales representatives should comply with the

4    law.  Of course, at the same time, Defendants did everything they could to make sure

5    sales representatives were trained to do the exact opposite.

6         42.    For example, Insys' training program for sales representatives was

7    designed solely to promote Subsys' off-label use to prescribing physicians.  First,

8    Insys instructed its sales representatives to avoid marketing to oncologists and instead

9    market to pain management specialists, even though they do not treat cancer patients.

10   According to Relator 1, Insys instructs its sales representatives to avoid working with

11   oncologists because they do not "treat pain," and therefore targeting them would be

12   far less profitable.[6]  Rather, Insys told sales representatives to market Subsys to pain

13   management specialists because they would be more likely to prescribe the drug, and

14   to do so in volume.   Insys' instructions were strictly followed by its sales

15   representatives.   According to Relator 1, in almost every instance, the pain

16   management specialists targeted by Insys' sales representatives had no patients with

17   cancer. Indeed, during the course of Relator 1's employment with Insys – during

18   which he spoke to countless physicians who prescribed Subsys – he never once dealt

19   with a pain management physician that had any patients with cancer.

20        43.    Insys' express focus on pain management physicians that do not treat

21   cancer patients represents a *prima facia* case of illegal off-label marketing.  Because

22   _____

23   Insys, he stated that the fact that Relator 1 had no prior experience in the pharmaceutical sales
     industry would allow him to be molded into someone who could "go off-label" much easier.

24   [6]    During his employment with Insys, Relator 1 informed management that his good friend in
     Buffalo, NY is the Clinical Director of CCS Oncology, a large cancer treatment center treating all

25   stages of cancer.  According to Relator 1, marketing Subsys to his friend would have produced at
     least twenty new Subsys "writers," resulting in an expanded market share for Subsys' indicated use.

26   Insys management, however, rejected Relator 1's proposition, and instructed him to concentrate on
     promoting Subsys to physicians that do not treat cancer patients.  Upon information and belief, Insys

27   did not want Relator 1 marketing Subsys to his friend, despite the fact that this would have produced
     several new Subsys writers for its actual indication, because Insys believed Relator 1's time was

28   better spent furthering its off-label marketing scheme.

1  Subsys is approved only for use on cancer patients with an opioid tolerance, the direct

2  targeting and marketing to doctors that have no cancer patients (and the corresponding

3  instruction not to market to oncologists) can be nothing else.

4    44.    Similarly, Insys repeatedly drilled into its sales representatives the mantra

5  that their main objective was to "generate market share."  According to Relator 1,

6  Insys trained its sales representatives to generate market share by convincing as many

7  physicians as possible to write prescriptions for Subsys, regardless of their patients'

8  conditions.  As a result of its narrow indication, Subsys has a very limited potential

9  customer base.  Therefore, by training its sales representatives to target physicians that

10  do not treat cancer patients and promote Subsys for off-label use, Insys sought to

11  generate a larger market share for Subsys than would otherwise be attainable.  That is,

12  by enlarging its potential customer base through off-label promotion, Insys also

13  enlarged the market for Subsys beyond the very limited pool of patients with

14  conditions consistent with Subsys' indication, thereby allowing it to capture a greater

15  market share.

16    45.    To establish the foregoing, Insys provided its sales representatives with a

17  scripted sales pitch as well as sample questions and answers to use when working with

18  physicians.  These scripts were designed to steer physicians into prescribing Subsys

19  off-label. Sales representatives practiced their sales pitch in role play training

20  exercises simulating physician interaction with the most senior of Insys management,

21  Insys Vice President of Sales Burlakoff and Chief Executive Officer Babich.[7]

22    46.    The scripted sales pitch – given to pain management specialists – in

23  relevant part, goes as follows:

24    *Sales Representative: "I know your time is money, so I'm not looking to*

25    *waste it.  I've been directed to deal with a specialist.  We have a*

26

27  [7]    According to Relator 1, Babich regularly attended training sessions where the techniques described herein were covered. In addition, according to Relator 1, Babich personally participated in the role play exercises.

28

- 16 -

*boutique drug that deals with your specialty, pain management. It is my understanding that the procedure in treating pain is to establish a baseline?"*

*Physician: "Yes."*

*Sales Representative: "With that being said, what percentage of your patients have chronic pain?"*

*Physician: "60%"*

*Sales Representative: "This is good.  My drug is looking for opioid tolerant patients. What percentage of your patients are experiencing breakthrough pain four times a day and are on other therapy?"*

*Physician: "A few"*

*Sales Representative: "These are the patients my drug wants to address. Oh, and there's a bonus: we'll take care of the managed care aspects of your patients [through our Internal Reimbursement Center]. If you're willing, I would like to go in greater detail over dinner."*

47.    Significantly, the scripted sales pitch never once mentioned that Subsys was approved only for opioid-tolerant patients with cancer.  In fact, according to Relator 1, the only instance where the word "cancer" was actually used during the role play exercises occurred while he was being trained to respond to a physician asking whether Subsys could be prescribed for patients without cancer (discussed below).[8] And even in such an instance, the word cancer was only uttered for the purpose of training sales representatives to promote Subsys for off-label purposes through allegory.

---

[8]    Although well-trained to persuade physicians into prescribing Subsy for off-label use, the sales representatives were not always successful.  For example, on one occasion, Relator 1 visited a physician on Route 73 to market Subsys. The physician, however, demanded Relator 1 leave his office because he was not an oncologist.  Rather, the physician's specialty was pain management, and he believed that fentanyl was too dangerous for his patients.  Moreover, according to Relator 1, this physician actually fired one or two of his staff because they were prescribing fentanyl products against his wishes.

48.     That is, as part of the role playing exercises, Insys trained its sales representatives to address the concerns of physicians over prescribing Subsys off-label.  In addressing these concerns, sales representatives were instructed to avoid explicitly stating that the physician should prescribe Subsys for unapproved purposes.  Instead, sales representatives were instructed to speak "in code" and to use allegory to communicate the same message.  For example, if a physician expressed reservations about prescribing Subsys for patients without cancer, sales representatives were instructed to ask:

> *Sales Representative: "Do you remember 1991? When Duragesic came out?"*
>
> *Physician: "Yes."*
>
> *Sales Representative: "What was that?"*
>
> *Physician: "A fentanyl patch."*
>
> *Sales Representative: "And it was approved for use only in cancer patients, wasn't it?"*
>
> *Physician: "Yes."*
>
> *Sales Representative: "Exactly."[9]*
>
> *Sales Representative: "How about this? Are you writing prescriptions for those patients for Fentora or Actiq?"*
>
> *Physician: "Yes."*
>
> *Sales Representative: "Great, our drug has the same indication as those."[10]*

---

[9]     "Exactly," of course, meaning that everyone knew that Duragesic was prescribed off-label for a host of uses.  In addition, during training, Burlakoff stated about the Durgesic patch "it's the same molecule as Subsys, [it] just [has a] different delivery method."

[10]     Again, according to Relator 1, this was the "code" they were supposed to use to encourage physicians to write Subsys for off-label use.  The goal was to convince physicians – without expressly saying to write Subsys off-label – that they should do so in the same way that many physicians prescribed Fentora and Actiq for off-label use.  According to the Food and Drug Administration's website, off-label prescribing of Fentora and Actiq is not uncommon. Overview of the May 6, 2008 ALSDAC Meeting to Discuss Supplement 005 to NDA 21-947 for an Expanded Indication for Fentora for Use in Break-Through Pain in Patients with Chronic Pain Not Caused by Malignancy (Apr. 26, 2008), *available at* http://www.fda.gov/ohrms/dockets/ac/08/briefing/2008-4356b2-01-fda.pdf.

49.    Insys was well-aware that its marketing practices for Subsys violated the prohibition on off-label marketing.  In order to conceal its fraudulent marketing practices, sales representatives were explicitly instructed not to email or text because management did not want internal discussion about the drug's marketing practices or the Internal Reimbursement Center ("IRC") (discussed below) written down.  Rather, all communications had to first go to the sales representatives' Regional Sales Manager ("RSM"), who would then speak directly with Burlakoff.

b.    **Insys Used and Marketed its IRC to Promote Subsys Off-Label Use**

50.    Insys also created its IRC to promote Subsys for off-label use to physicians.  The IRC ostensibly exists to assist physicians with obtaining prior authorization for Subsys prescriptions from their patients' insurers and Medicare/Medicaid.  In reality, however, the IRC existed to make it easier for physicians to prescribe Subsys for off-label use by virtually guaranteeing that Subsys prescriptions for patients without cancer would receive authorization.  Moreover, if the IRC could not immediately obtain authorization for a patient's Subsys prescription, Insys guaranteed to provide free Subsys to the patient until it could obtain approval.  All of the services just mentioned are provided by Insys as part of a marketing ploy to encourage physicians to prescribe Subsys for off-label use by addressing the concerns of physicians writing these prescriptions.

51.    To provide some background, prior authorization is a feature provided by insurers and Medicare/Medicaid to ensure that certain drugs are prescribed appropriately.  Prior authorization helps to ensure that these drugs are used correctly and ***only*** when necessary.  In other words, insurers and Medicare/Medicaid require prior authorizations to prevent improper prescribing or use of certain drugs that may not be the best choice for a particular health condition.  When a patient brings a prescription which requires prior authorization to the pharmacy to be filled, the pharmacist is notified that prior authorization is required.  The pharmacist will then

contact the patient's physician, who contacts the insurer to submit additional information, typically in the form of a letter of medical necessity ("LMN") for the prescription.   The insurer will then either grant authorization, and pay for the prescription, or deny authorization, in which case the physician can either appeal the insurer's decision or prescribe a different medication.   Typically, when a patient is prescribed a medication for its indicated use, obtaining prior authorization is relatively simple.   When a physician prescribes a medication for off-label use, however, obtaining prior authorization can be much more difficult.

52.     The IRC is utilized by Insys as a marketing ploy to encourage physicians to prescribe Subsys for off-label purposes.   Although Insys purportedly used the IRC to assist physicians in obtaining prior authorization for Subsys prescriptions, in reality, the IRC existed to assist physicians writing off-label Subsys prescriptions.   This is demonstrated by the two main incentives the IRC provides to physicians: (1) the IRC guaranteed that patients without cancer would obtain prior authorization for Subsys prescriptions that should have been denied (or Insys would provide the drug, itself, for free); and (2) the IRC relieved physicians from having to perform the administrative responsibilities associated with obtaining prior authorization for Subsys prescriptions.

53.     First, by guaranteeing prior authorization for Subsys prescriptions, the IRC was able to significantly mitigate a major concern of physicians considering prescribing Subsys off-label.   According to Relator 1, Insys instructed its sales representatives that their ultimate goal was to convince physicians  to opt-in to the IRC program.   In order to opt-in, a physician would fill out an IRC request form.[11] The IRC request form incorporated a prescriptions box, which the physician would fill out with the patient information, and then send it to the IRC.   Then, the IRC would use that form and obtain authorization for the Subsys prescription from the patient's insurer or Medicare/Medicaid. According to Relator 1, Insys instructed IRC staff

---

[11]    Attached as Ex. 2 is a copy of the IRC request form.

handling IRC requests to obtain approval for a 800 mcg/dose, despite the fact that physicians typically wrote prescriptions for 100 mcg/dose, Subsys' initial dosage. By doing this, IRC would not have to go back to obtain approvals for subsequent prescriptions. The IRC would also handle all appeals if the initial request for prior authorization was denied. In addition, after a physician opted in, all future prescriptions for Subsys were directed to IRC, not a local pharmacy. Thus, through its handling of subsequent off-label Subsys prescriptions, Insys was able to assure physicians that not only would the initial Subsys prescription receive prior authorization, but so too would all subsequent prescriptions.

54. Using a variety of techniques, Insys was able to ensure that virtually every off-label Subsys prescription received prior authorization. For example, according to Relator 1, one way IRC staff obtained prior authorization was through their relationships with the individuals making prior authorization determinations for the insurers and Medicare or Medicaid. Moreover, in instances where IRC's connections were of no utility, IRC staff would, as a matter of course, say whatever was necessary to receive prior authorization. For example, IRC employees would regularly say things along the lines of "the patient can't" or "has severe difficulty swallowing oral medications," even though nothing resembling such a diagnosis was contained in the cover letter from the doctor's office. Other examples of IRC staff falsifying patient conditions to obtain approval for Subsys include the following: "Patient is unable to digest oral medications"; "patient suffers from almost constant severe pain"; "patient's pain limits his or her quality of life"; "patient is unable to participate in normal life (sit, stand, reach, walk, ride in cars) because of the pain." All of the patient conditions just mentioned were scripted and completely falsified by IRC staff – at the direction of Insys senior management – for the sole purpose of fraudulently obtaining prior authorization for off-label Subsy prescriptions. *See* Ex. 3 (sample letter with the foregoing already written and "fill in the blanks" spaces for patient name).

55.    In addition, during Relator 1's training, he was brought to the IRC to observe how they obtain prior authorizations for sales representatives in the field. While visiting the IRC, Relator 1 heard Kim Fordham ("Fordham") state that the patient she was attempting to obtain prior authorization for was having difficulty swallowing oral medications, despite the fact that this diagnosis was not contained in the cover letter from the prescribing physician.  It was during this visit that Fordham informed Relator 1 that the IRC regularly obtains authorization through its numerous connections at various insurance companies, and if these connections do not result in obtaining prior authorization "they know what to say to get the scripts approved."

56.    The IRC was a resounding success.  According to Relator 1, the IRC obtained prior authorization for Subsys 70% of the time on the first request – even though the majority of those prescriptions were for patients who did not have cancer. Moreover, Relator 1 does not know of a single instance where a prior authorization request was handled by the IRC and not eventually approved.

57.    Insys trained its sales representatives to make the IRC's success rate at obtaining prior authorization a major point of emphasis when promoting Subsys to physicians.  For example, sales representatives were provided with sample questions and answers addressing physicians' concerns regarding obtaining patient approval for off-label use.  For example, the following is a scripted question and answer provided to Relator 1 during training: "Physician Question: 'Isn't fentanyl hard to get approved for a non-cancer use?  I'll just keep writing "short acting" opiates [like Oxy, Hydrocodone, Hydromorphone] instead.' Sales Representative Response: 'We take care of that through our IRC.  We can get prior authorizations for you and take care of everything.  We have a 70% pull through rate [approval rate] the first time.'"

58.    In addition to the above, Insys guaranteed, and touted that guarantee, to physicians that, if for some reason prior authorization could not be immediately obtained, Insys would provide the patient with free Subsys until authorization could

1  be obtained.[12]  This was no small perk: a thirty-day supply of Subsys cost
2  approximately $10,000.

3      59.  The second benefit the IRC provided to physicians writing off-label
4  prescriptions for Subsys was that the IRC, rather than the physician, undertakes a
5  majority of the administrative tasks associated with obtaining prior authorizations for
6  Subsys prescriptions.  In addition to the uncertainty of whether the off-label
7  prescriptions will receive prior authorization, physicians might also refrain from
8  prescribing Subsys off-label because of the exhaustive administrative requirements
9  associated with obtaining prior authorization.  According to Relator 1's training
10 materials, the administrative responsibilities associated with obtaining patient
11 approvals can be very time consuming.[13]  Thus, physicians might be deterred from
12 prescribing Subsys to patients without cancer because of the hassle associated with
13 obtaining prior authorizations.  Therefore, by handling the administrative
14 responsibilities, Insys has removed yet another possible roadblock to a physician's
15 decision to prescribe Subsys to patients without cancer.

16     60.  The services provided to physicians by the IRC and the guarantee to
17 provide free Subsys if authorization cannot be obtained further demonstrate that Insys
18 intended to and did in fact promote Subsys for off-label use.  First, the IRC's ability to
19 obtain prior authorization in virtually every instance and Insys' guarantee would
20 provide no value to physicians prescribing Subsys for its indicated use.  Recognizing
21 that the uncertainty regarding a patient's ability to access Subsys could be a major
22 deterrent to physicians considering prescribing Subsys off-label, Insys offered the
23 IRC's expertise in obtaining prior authorization and guarantee of free product if
24 authorization could not be obtained. To a physician prescribing Subsys for its
25 indicated use, however, these services would be of little or no value, and therefore

26
27 [12]  Attached as Ex. 4 is a copy of Relator 1's training material discussing Insys' guarantee to provide free Subsys if prior authorization could not be obtained.

28 [13]  Attached as Ex. 5 is a copy of Relator 1's training material discussing the foregoing.

1    unnecessary.  In such an instance, the ability to obtain prior authorization for Subsys

2    prescriptions (or to deal with administrative appeals) would not be a concern to a

3    physician prescribing Subsys for its indicated use because Medicare/Medicaid would

4    not deny prescriptions written for opioid-tolerant patients who had cancer.

5         61.    Not surprisingly, the IRC was very popular with physicians – so

6    successful that virtually all of the physicians writing off-label Subsys prescriptions

7    utilized the IRC.  Indeed, according to Relator 1, approximately 80-90% of patients

8    prescribed Subys did not have cancer, and virtually all of those patients obtained prior

9    authorization through the IRC because without IRC's expertise prior authorization

10   would not have been possible.  In fact, Relator 1 is aware of just one physician who

11   was able to obtain prior authorization for Subsys without the use of the IRC, and that

12   was for a patient who had cancer.

13               c.    **Insys Provided Physicians With A "Canned"**
                       **Letter of Medical Necessity to Encourage**
14                     **Physicians to Prescribe Subsys Off-Label**

15        62.    To provide prescribing physicians with further assurance in its ability to

16   receive prior authorization for off-label Subsys prescriptions, Insys provided its sales

17   representatives and other staff with a standardized "canned" LMN to be distributed to

18   prescribing physicians.[14]  As stated above, when an insurer or Medicare/Medicaid

19   requires prior authorization before it will pay for a prescription drug, the prescribing

20   physician typically submits an LMN outlining why the drug is medically necessary for

21   the patient's treatment.  Obviously, these letters must be patient specific, as the letter

22   is meant to establish that a particular drug is medically necessary for a particular

23   patient.

24        63.    According to Relator 1, the form LMN contained the "magic language"

25   to obtain patient approvals.  The form LMN is not patient specific, and requires only

---

[14]    In June 2013, Insys emailed a copy of the form LMN to all sales representatives and associated personnel.  Attached as Ex. 6 is the email distributed by Insys.  The LMN is previously identified at Ex. 3.

that physicians fill in the blanks and submit the form.[15]  In fact, the falsified patient conditions mentioned above which IRC staff used to obtain prior authorization were also included in Insys' form LMN.

64.    As with the use of the IRC, Defendants' fraudulent intent is demonstrated by the "canned" LMN because such a letter would be unnecessary if Subsys was written for its indicated use. A physician seeking prior authorization for Subsys' approved use would not need "magic language" – he or she would only need to write the actual patient symptoms, mainly that the patient was opioid-tolerant and has breakthrough pain caused by cancer.

### d.    Defendants Increase the Health Risk to Patients by Promoting Subsys for Off-Label Use

65.    Defendants' promotion of Subsys for off-label use increases the health risk to patients receiving these prescriptions.  Fentanyl, the opioid analgesic in Subsys, is a very powerful pain management medication (which is why it is only indicated for use on cancer patients).  Indeed, according to the Department of Justice, "Fentanyl is 100 times more potent than morphine as an analgesic."[16]  Fentanly's strength has been demonstrated recently by the increasing number of drug overdose deaths involving Fentanyl.   In addition, according to the U.S. Center for Disease Control and Prevention, the people "who are most at risk for overdose" include those people "who take high daily dosages of prescription painkillers[.]"[17]

66.    Prescribing very strong pain medication can also lead to opioid

---

[15]    For example, one sentence in the form LMN reads "While I am aware of the risks associated with this class of medications, SUBSYS is necessary for (said patient) to effectively treat the onset and duration of their breakthrough pain episodes."  The form LMN also includes other patient specific references, such as "[i]njectable pain relievers are not an option for this patient."  Indeed, providing such a letter is even contrary to Subsys' website's prior authorization support page, which states "Healthcare providers are responsible for providing any medical necessity justifications."

[16]    Drug & Chemical Evaluation Section, Department of Justice, Drug Enforcement Administration, *available at* http://www.deadiversion.usdoj.gov/drug_chem_info/fentanyl.pdf.

[17]    Policy Impact: Prescription Painkiller Overdoses, Centers For Disease Control and Prevention, *available at* http://www.cdc.gov/homeandrecreationalsafety/rxbrief/.

dependence and addiction.  Opioid dependence can occur when an individual's pain management treatment involves prescription opioid pain medication.  As a result of taking this medication, an individual can become physically dependent on opioids – if the drug is stopped, they will suffer from withdraw syndrome.  Moreover, it is well documented that opioid addiction is a serious problem.  These powerful drugs can create a feeling of euphoria, cause physical dependence and, in some people lead to addiction.  The chance that a patient will become physically dependent on opioids or addicted is increased when the patient is prescribed stronger pain medication than is medically necessary.

67.    Insys' promotion of Subsys for off-label purposes has resulted in an increased risk of overdose and opioid dependence and/or addiction in patients receiving the drug.  Due to Insys' off-label marketing scheme for Subsys, patients prescribed the drug are receiving stronger pain medication than is medically necessary – patients without cancer are receiving pain medication for use in cancer patients.  As a result, these patients are at an increased risk of overdosing, and becoming opiod dependent and/or addicted.  Insys has created this increased risk to Subsys users, in the name of profit, by encouraging physicians to prescribe Subsys when such a powerful drug is not medically necessary to treat patients' conditions.

**e.    Claims Submitted to Government Health Care Programs for Off-Label Uses Were Not Covered**

68.    The claims submitted to Government health care programs for off-label Subsys prescriptions were false because the prescriptions were not properly covered.  As a precondition to payment, healthcare providers are required to verify on Form HCFA-1500 that the prescriptions and services they provide are "medically indicated and necessary for the health of the patient."  As shown, above, the prescriptions that Defendants were inducing physicians to write were neither medically indicated nor necessary.  Rather, they were expressly for off-label and improper uses, and violated the FCA.

69.   In the Medicaid Program, States will not receive FFP if a drug, as prescribed, is not for a medically acceptable use.  FFP is available to States only for "covered outpatient drugs." 42 U.S.C. §1396b(i)(10).  As a result, States' own laws and pharmacy regulations require the drugs to be used for a medically accepted use, and therefore fit the definition of a covered outpatient drug.

70.   "Covered outpatient drugs" do not include drugs that are "used for a medical indication which is not a medically accepted indication." 42 U.S.C. §1396r-8(k)(3). A medically accepted indication is defined as a use "which is approved under the [FDCA]" or which is "supported by one or more citations included or approved for inclusion" in specified drug compendia. 42 U.S.C. §1396r-8(k)(6). 42 U.S.C. §1396r-8(g)(1)(B)(I) identifies the compendia to be consulted: American Hospital Formulary Service Drug Information; United States Pharmaeopeia-Drug Information; and the DRUGDEX information System (collectively, the "Drug Compendia").

71.   Medicare Part A generally pays the inpatient services for eligible beneficiaries in hospital, hospice and skilled nursing facilities, as well as some home healthcare services.  42 U.S.C. §§1395e-1395i-5.  Prescription drugs are covered under Medicare Part A only if they are administered on an inpatient basis in a hospital or similar setting, and are "reasonable and necessary."

72.   Medicare Part B pays for some types of prescription drugs that are not administered in a hospital setting, and that are "reasonable and necessary." 42 U.S.C. §§1395k(a), 1395x(s)(2); 42 C.F.R. §405.517.  These typically include drugs administered by a physician or other provider in an outpatient setting, some orally administered anticancer drugs and antiemetics (drugs which control the side effects caused by chemotherapy), and drugs administered through durable medical equipment such as a nebulizer.  42 U.S.C. §§1395k(a), 1395x(s)(2); 42 C.F.R. §405.517.

73.   The Medicare program Part D drug benefit covers all drugs that are considered "covered outpatient drugs" under 42 U.S.C. §1396r-8(k).

74.   The off-label uses alleged herein are not supported by "clinical research

- 27 -

1 that appears in peer-reviewed medical literature," and could not, under any
2 circumstances, be determined to be "medically accepted as safe and effective" or
3 "reasonable and necessary" for such uses. Claims for such off-label uses were
4 therefore not covered by Medicare either.

5     75. Insys was aware that the natural and probable consequence of its
6 promotion of off-label uses of Subsys was that health care providers would submit
7 claims for payment to Government Healthcare Programs for the off-label use.
8 Notwithstanding this knowledge, Insys vigorously promoted these off-label uses.
9 Insys was also aware that its illegal promotion did in fact result in false claims to these
10 and other Government payors for the off-label uses. Moreover, Insys was aware that
11 its promotion activities was a substantial factor in producing the claims.

12     76. When pharmacies, physicians and other healthcare providers submitted
13 claims based upon a physician's prescription for Subsys for off-label uses, the claims
14 they submitted were false because such off-label uses were not supported by a citation
15 in one of the Drug Compendia specified by 42 U.S.C. §1396r-8(g)(1)(B)(1)
16 (Medicaid), not supported by "clinical research that appears in peer-reviewed medical
17 literature," and could not, under any circumstances, be determined to he "medically
18 accepted generally as safe and effective" or "reasonable and necessary" (Medicare).

19     77. False claims to these Government health care programs for off-label
20 prescribing was the direct and proximate result of unlawful off-label marketing efforts
21 by Insys. Therefore, Insys caused the submission of these claims. Insys caused the
22 submission of false claims, since healthcare providers submitted Pharmacy Claim
23 Forms and CMS 1500 Form to Government Healthcare Programs, and the States
24 submitted Form CMS-64 to the Federal Government, all claiming reimbursement for
25 Subsys for such off-label uses.

26         **2.    Insys Illegally Paid Kickbacks in Exchange for**
               **Promotion and Prescription of Subsys**
27
28     78. In an attempt to increase its market share, Insys also paid illegal

kickbacks to physicians to induce them to write Subsys prescriptions that were reimbursed through federal health care programs.   As a front for its kickback arrangement, Insys conducted speaker programs that were actually vehicles for paying kickbacks to physicians under the guise of honoraria.  These financial benefits were offered with the explicit understanding that in exchange, the physicians would preferentially prescribe or indicate the use of Subsys to its patients.

79.    Through Insys' speaker program, physician speakers were paid to speak at local and national events to educate other doctors and health care professionals about Subsys.   In practice, however, Insys' speaker program exists to induce physicians to both begin prescribing Subsys ***and*** to increase the quantity of Subsys prescriptions they write.

80.    According to Relator 1, the criteria used to determine the amount of compensation a physician received for speaking at events depended ***solely*** upon the volume of Subsys prescriptions he or she had written.  To induce the foregoing, Insys created two tiers of compensation for physicians hired as speakers.   Whether a physician is compensated at the higher tier depended on how many Subsys prescriptions he or she has written.  The highest (or first level) tier of compensation was for physicians deemed "national speakers."   National speakers would speak at conferences and meetings across the country.   Insys selected its "top writers" of Subsys prescriptions for national speaker positions.  The lower (or second level) tier of compensation is for physicians deemed "local speakers."   Local speaker positions were provided to physicians writing a significant amount of Subsys prescriptions, but not as many as national speakers.

81.    The qualifications of the physicians hired by Insys as speakers demonstrate that its speaker program was nothing more than a mechanism to facilitate kickbacks in return for writing Subsys prescriptions.  As Subsys' indicated use is for cancer patients, it would be reasonable to expect that the physicians Insys selected to educate and inform other physicians and health care professionals about the drug

would be oncologists, or otherwise have at least some level of expertise in dealing with cancer patients.  And yet, Insys did not condition its selection of speakers on whether they had a pedigree that included cancer treatment.  Instead, Insys focused solely on those physicians who wrote the most prescriptions for Subsys.

82.   In addition, Insys passed over physicians far more qualified than the physicians selected for speaker positions.  For example, physicians who did not prescribe as much Subsys would not be selected as speakers, even though they had the same (or greater) qualifications than those selected.

83.   Insys promoted the fruits of being selected as speakers at its conferences through its sales representatives.  As part of their training, sales representatives were provided with different physician "personality" types that they would encounter when promoting Subsys. Each personality type was given a corresponding color.  Then, using the different physician personality types, Insys trained its sales representatives to identify which physician personality type to offer speaker positions to and which personality types to avoid. For example, physicians categorized as "Yellow" were described as an "amiable doctor," but not the best customer.  Sales representatives were instructed not to offer speaker positions to Yellow physicians, regardless of their personality or qualifications (the two main reasons to exclude a physician from a potential speaker position).  "Red" physicians were described "fast moving."  Insys trained its sales representatives to show them headlines and avoid wasting their time. Sales representatives were further instructed that Red physicians presented a business opportunity and therefore these physicians were to be offered speaker positions. There is no explanation for Insys' method of identifying physicians for speaker positions based on personality type (and not their actual personality or credentials) other than that Insys, based on its experience in the drug manufacturing and promotion industry, targeted these physicians because it believed they were the most likely to write the most Subsys prescriptions in return for speaker positions.

84.   Insys also used the speaker program to encourage physicians currently

writing Subsys prescriptions to increase the number of Subsys prescriptions they were writing.  The speaker positions offered by Insys were highly coveted.  And it was no secret that the key to landing these speaker positions was to increase the amount of Subsys prescriptions written.  Thus, it was explicitly understood by physicians that these speaker positions were given to physicians in exchange for writing a significant amount of Subsys prescriptions.  For example, according to Relator 1, he was once approached by Dr. Manish Singh, a Neurology and Pain Management physician prescribing Subsys to his patients. Dr. Singh stated that "I want more dinners and to do speaking programs."  Relator 1 relayed Dr. Singh's request to his RSM, who said "no" to Dr. Singh's request because "he was not writing enough prescriptions [for Subsys]."

85.     Both the pharmaceutical industry and Insys have recognized the potential for abuse of "educational" speaker programs. Contained in Insys' training module for sales representatives is a section entitled "Compliance."  This section contains the Pharmaceutical Research and Manufacturers of America's ("PhRMA")[18] Code on Interactions with Health care Professionals (the "Code") issued in 2004 and reissued in 2009.[19] Within the PhRMA Code (and therefore within Insys training module) is a section entitled "Speaker Programs and Speaker Training Meetings." This section provides, in part, that:

> Healthcare professionals participate in company-sponsored speaker
> programs in order to help educate and inform other healthcare

---

[18]   Insys, along with other major pharmaceutical companies, is a member of PhRMA, a signatory to the Code and has announced its intention to abide by the Code.  The PhRMA Code provides that "[i]nteractions" between pharmaceutical company employees and health care professionals should be focused on informing healthcare professionals about products, providing scientific and educational information, and supporting medical education." In addition, Insys has expressly certified that it is in compliance with the Code.

[19]  The   PhRMA   Code   is   available   at:   http://www.phrma.org/sites/default/files/ pdf/phrma_marketing_code_2008.pdf.

professionals about the benefits, risks and appropriate uses of company medicines.

Any healthcare professional engaged by a company to participate in such external promotional programs on behalf of the company will be deemed a speaker for purposes of this Code, and the requirements of Section 7 apply to company interactions with that healthcare professional in his or her capacity as a speaker.  Company decisions regarding the selection or retention of healthcare professionals as speakers should be made based on defined criteria such as general medical expertise and reputation, knowledge and experience regarding a particular therapeutic area, and communications skills.  Companies should continue to ensure that speaking arrangements are neither inducements nor rewards for prescribing a particular medicine or course of treatment.

86.    Despite Insys' recognition that its speaker program could be used to influence the decision making of physicians, Insys disregarded the illegality of such practices.

## COUNT I

## (False Claims Act 31 U.S.C. §3729(a))

87.    Relators repeat each allegation in each of the proceeding paragraphs of this Complaint with the same force and effect as if set forth herein.

88.    As described above, Defendants have submitted and/or caused to be submitted false or fraudulent claims to Medicare by engaging in an unlawful kickback scheme and off-label marketing in connection with its drug Subsys that was intended to and did in fact induce physicians to improperly prescribe Subsys.   These prescriptions were reimbursed by federal health care programs, including Medicare and Medicaid, and therefore were issued in violation of both the Anti-Kickback Statute and the FCA. As a result, the federal Government has been defrauded and suffered a substantial loss.

89.     By virtue of the acts described above, Defendants have violated:

(1)     31 U.S.C. §3729(a)(1)(A) by knowingly presenting, or causing to be presented, false or fraudulent claims for payment or approval; and/or

(2)     31 U.S.C. §3729(a)(1)(B) by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim; and/or

(3)     31 U.S.C. §3729(a)(1)(G) by knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government.

90.     To the extent any of the conduct alleged herein occurred on or before May 20, 2009, Relators reallege that Defendants knowingly violated 31 U.S.C. §3729(a)(1); 31 U.S.C. §3729(a)(2); and 31 U.S.C. §3729(a)(7) prior to amendment, by engaging in the above-described conduct.

91.     By reason of the foregoing, the United States has suffered actual damages and is entitle to recover treble damages plus a civil monetary penalty for each false claim.

**JURY TRIAL DEMANDED**

Relators demand a jury trial.

**PRAYER FOR RELIEF**

WHEREFORE, Relators pray that the Court enter judgment against Defendants as follows:

A.     that the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims alleged within this Complaint, as the Federal False Claims Act, 31 U.S.C. §§3729 *et seq*. provides;

1    B.    that civil penalties of $11,000 be imposed for each and every false claim
2    that Defendants caused to be presented to the United States and/or its grantees, and for
3    each false record or statement that Defendants made, used, or caused to be made or
4    used that was material to a false or fraudulent claim;

5    C.    that attorneys' fees, costs, and expenses that Relators necessarily incurred
6    in bringing and pressing this case be awarded;

7    D.    that Relators be awarded the maximum amount allowed to them pursuant
8    to the False Claims Act; and

9    E.    that this Court order such other and further relief as it deems proper.

10   DATED:  May 6, 2014                    Respectfully submitted,

11                                          THE WEISER LAW FIRM, P.C.
                                            KATHLEEN A. HERKENHOFF
12                                          (168562)

13

14

15                                          KATHLEEN A. HERKENHOFF

16                                          12707 High Bluff Drive, Suite 200
                                            San Diego, CA 92130
17                                          Telephone:  (858) 794-1441
                                            Facsimile:  (858) 794-1450
18                                          kah@weiserlawfirm.com

19                                          Robert B. Weiser
20                                          Christopher L. Nelson
                                            James M. Ficaro
21                                          Ross M. Wolfe
22                                          22 Cassatt Avenue
                                            Berwyn, PA 19312
23                                          Telephone: (610) 225-2677
24                                          Facsimile: (610) 225-2678
                                            cln@weiserlawfirm.com
25                                          jmf@weiserlawfirm.com
26                                          rmw@weiserlawfirm.com

27                                          Attorneys for Qui Tam Plaintiffs

28

- 34 -

COPY

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☐ )

UNITED STATES OF AMERICA, ex rel., JOHN DOE and ABC, LLC

**DEFENDANTS** ( Check box if you are representing yourself ☐ )

INSYS THERAPEUTICS, INC, ALEC BURLAKOFF and MICHAEL L. BABICH

**(b) County of Residence of First Listed Plaintiff**
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**County of Residence of First Listed Defendant**  Maricopa Cnty AZ
*(IN U.S. PLAINTIFF CASES ONLY)*

**(c) Attorneys** *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information.

Kathleen A. Herkenhoff, The Weiser Law Firm, P.C., 12707 High Bluff Drive, Suite 200, San Diego, CA 92130.  Telephone: (858) 794-1441.

**Attorneys** *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information.

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☒ 1. U.S. Government Plaintiff

☐ 2. U.S. Government Defendant

☐ 3. Federal Question (U.S. Government Not a Party)

☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding

☐ 2. Removed from State Court

☐ 3. Remanded from Appellate Court

☐ 4. Reinstated or Reopened

☐ 5. Transferred from Another District (Specify)

☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No   (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No   ☐ **MONEY DEMANDED IN COMPLAINT:** $

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause.  Do not cite jurisdictional statutes unless diversity.)

31 U.S.C. §§ 3730, et seq

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☒ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | |
| ☐ 896 Arbitration | ☐ 196 Franchise | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| | **REAL PROPERTY** | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 367 Health Care/Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/Accommodations | ☐ 740 Railway Labor Act | |
| | ☐ 220 Foreclosure | | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

CV14-3488

**FOR OFFICE USE ONLY:**   Case Number:

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII.  VENUE:**  Your answers to the questions below will determine the division of the Court to which this case will most likely be initially assigned.  This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| Question A:  Was this case removed from state court? | STATE CASE WAS PENDING IN THE COUNTY OF: | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| ☐ Yes  ☒ No | ☐ Los Angeles | Western |
| If "no," go to Question B.  If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | ☐ Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | Eastern |

| Question B:  Is the United States, or one of its agencies or employees, a party to this action? | If the United States, or one of its agencies or employees, is a party, is it: | | INITIAL DIVISION IN CACD IS: |
|---|---|---|---|
| | A PLAINTIFF?  Then check the box below for the county in which the majority of DEFENDANTS reside. | A DEFENDANT?  Then check the box below for the county in which the majority of PLAINTIFFS reside. | |
| ☒ Yes  ☐ No | ☐ Los Angeles | ☐ Los Angeles | Western |
| If "no," go to Question C.  If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | ☐ Ventura, Santa Barbara, or San Luis Obispo | ☐ Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | ☐ Riverside or San Bernardino | Eastern |
| | ☒ Other | ☐ Other | Western |

| Question C: Location of plaintiffs, defendants, and claims? (Make only one selection per row) | A. Los Angeles County | B. Ventura, Santa Barbara, or San Luis Obispo Counties | C. Orange County | D. Riverside or San Bernardino Counties | E. Outside the Central District of California | F. Other |
|---|---|---|---|---|---|---|
| Indicate the location in which a majority of plaintiffs reside: | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ |
| Indicate the location in which a majority of defendants reside: | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ |
| Indicate the location in which a majority of claims arose: | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ |

**C.1. Is either of the following true? If so, check the one that applies:**

☐ 2 or more answers in Column C

☐ only 1 answer in Column C and no answers in Column D

Your case will initially be assigned to the
SOUTHERN DIVISION.
Enter "Southern" in response to Question D,  below.

If none applies, answer question C2 to the right.  ➡

**C.2. Is either of the following true? If so, check the one that applies:**

☐ 2 or more answers in Column D

☐ only 1 answer in Column D and no answers in Column C

Your case will initially be assigned to the
EASTERN DIVISION.
Enter "Eastern" in response to Question D,  below.

If none applies, go to the box below.  ➡

Your case will initially be assigned to the
WESTERN DIVISION.
Enter "Western" in response to Question D below.

| Question D: Initial Division? | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, or C above:  ➡ | Western Division |

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**IX(a). IDENTICAL CASES**: Has this action been previously filed **in this court** and dismissed, remanded or closed?  ☒ NO  ☐ YES

If yes, list case number(s): _____

**IX(b). RELATED CASES**: Have any cases been previously filed **in this court** that are related to the present case?  ☒ NO  ☐ YES

If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**

(Check all boxes that apply)  ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**X. SIGNATURE OF ATTORNEY**
**(OR SELF-REPRESENTED LITIGANT):**  _Kathleen A. Kuehler_   DATE: 5/6/2014

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |